## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ELLIOT STEED,** | : | **No. 4:22cv1773** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **GEISINGER HEALTH d/b/a** | : | |
| **GEISINGER HEALTH SYSTEM;** | : | |
| **AND GEISINGER WYOMING** | : | |
| **VALLEY MEDICAL CENTER,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

Plaintiff Elliot Steed asserts claims against his former employer, Geisinger Wyoming Valley Medical Center ("GWVMC") and its parent company, Geisinger Health, (collectively "defendants" or "Geisinger"), for disability discrimination, retaliation, failure to accommodate, and wrongful discharge, pursuant to the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), the Pennsylvania Human Relations Act, 43 Pa. Stat. §§ 951, *et seq.* ("PHRA"), and state law. Before the court is a motion for summary judgment filed by defendants as to each claim. (Doc. 23). Having been fully briefed, defendants' motion is ripe for disposition.

## Background

Plaintiff worked as an environmental services technician for GWVMC from April 19, 2021, until July 31, 2021.[1] (Doc. 24, SOF ¶¶ 8, 80).  In this role, Steed's duties consisted of cleaning, removing trash, changing the linens, and pushing and pulling large bins. (Id. ¶ 11).  Defendants terminated the plaintiff on July 31, 2021, using a document called a "Performance Improvement Plan" (hereinafter "Termination PIP").  That document indicates that Steed accrued eleven (11) absences from work in a three-month period, which defendants called "occurrences."  (Id. ¶ 80; Doc. 24-2, Def. Ex. A., Pl. Dep. Ex. P-4 at ECF pp. 64-66).

Steed maintains, however, that the absences were not unscheduled, and that some of them were related to his work-related back injury.  Per the plaintiff, defendants terminated him because he: 1) had a physical impairment that substantially limited some of his major life activities; 2) had a record of such impairment; 3) and was regarded as having such impairment.  In other words, Steed asserts that his back injury satisfies each definition of "disability" under the ADA.

---

[1] Unless noted otherwise, the court cites to the defendants' statement of material facts ("SOF"), (Doc. 24), for facts which the plaintiff admitted in his response to the SOF, (see Doc. 31).  All facts from the record are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015) (citation omitted).

Steed was subject to an introductory period policy while employed with Geisinger. (Doc. 24, SOF ¶¶ 12, 76). For additional context, this policy provides that a newly-hired employee is placed on a six-month probationary period beginning the first day of employment. (Doc. 24-2, Def. Ex. A., Pl. Dep. Ex. P-12, at ECF pp. 72-74). According to the policy, this period allows Geisinger to properly evaluate the employee's performance and adaptability to the requirements and needs of the position. (Id.) Per the policy's terms, Geisinger has the right and authority to terminate an employee for any question or concern about performance without the need to provide specific reasons for termination. (Id.) This includes excessive absenteeism and tardiness. (Doc. 24-3, Def. Ex. B, Geisinger Hospitality Services Attendance Policy, at ECF p. 3). In this matter, an employee relations specialist for GWVMC, Celeste Kreischer, testified that, when an employee within the introductory period accrues two (2) attendance "occurrences," a written warning is issued. (Doc. 24-4, C. Kreischer Dep., 45:7-12). She also testified that the next attendance occurrence after a written warning warrants termination of employment. (Id. at 45:9-13).

As for the occurrences at issue in this case, Steed did not report to work on May 3, 13, 28 or June 1, 2021. (Doc. 24-2, Pl. Dep., 67:5-11). He testified that he missed work on these dates due to court appearances related to child custody and support actions. (Id. at 49:7-12, 67:5-11). He also testified that these

absences were not related to any alleged workplace injury or medical condition. (Id. at 67:5-11).

On June 3, 2021, Steed received and signed a written warning document also entitled "Performance Improvement Plan" ("June 3 PIP"). (Doc. 24-2, Def. Ex. A., Pl. Dep. Ex. P-3, at ECF pp. 62-63). The June 3 PIP indicates that representatives from GWVMC reviewed the attendance policy and call-off procedures with the plaintiff. (Id.) According to the June 3 PIP, disciplinary action up to and including termination of plaintiff was warranted upon any additional unscheduled absences. (Id.)

Steed then experienced more attendance issues. On June 14, 2021, Steed left work forty-five (45) minutes early without authorization to do so. (Doc. 24-2, Pl. Dep., 69:23-70:9; Doc. 24-2, Def. Ex. A., Pl. Dep. Ex. P-4, Performance Improvement Plan, at ECF pp. 64-66). Steed testified that he did not remember why he left early that day but confirmed that this departure was not related to an alleged work injury. (Doc. 24-2, Pl. Dep., 69:23-70:9). Additionally, the plaintiff failed to appear at work on June 21, 2021. (Id. at 70:10-15). Steed testified that this absence could have been related to a court appearance for a criminal or traffic matter. (Id. at 70:16-71:12). Despite Kreischer's testimony about termination being warranted in these circumstances, defendants did not terminate the plaintiff after these occurrences.

Then, on July 3, 2021, Steed allegedly suffered a back injury at work after he fell loading linens onto a truck. (Doc. 24, SOF ¶ 94).  According to a medical report, plaintiff went to the emergency room after straining his back that day. (Doc. 31-7, Pl. Ex. G, Medical Records).  Steed returned to work on July 5, 2021, following the Independence Day holiday.  Per Steed's testimony, he told his direct supervisor, Jennifer Marcano, that he hurt his back on the job. (Doc. 31-1, Pl. Dep., 86:4-87:9).

Steed missed work again on July 6, 2021. (Doc. 24, SOF ¶ 51).  Steed contends that this absence was due to his back injury. (Doc. 24-2, Pl. Dep., 74:11, 75:6).  He relies on a TigerText[2] message between Marcano and another supervisor, John Tomsak, where Tomsak told Marcano that Steed went to a clinic. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF p.5).

On July 8, 2021, Steed then left work 230 minutes early. (Doc. 24, SOF ¶ 51).  He testified that his reason for leaving early that day was to go to the emergency room for his back injury. (Doc. 24-2, Pl. Dep., 89:23-90:9).  The emergency room was located on the same hospital campus where Steed worked. (Doc. 31-7, Pl. Ex. G, Medical Records).  Per his testimony, Steed reported his work related back injury to the emergency room registration workers,

---

[2] TigerText, also known as TigerConnect, is a secure text messaging application designed for healthcare communication. TIGERCONNECT, https://tigerconnect.com/products/clinical-collaboration-platform/secure-text-messaging/ (last visited July 19, 2025).

but he did not know whether they relayed this information to his supervisors. (Doc. 24-2, Pl. Dep., 89:23-90:9).  Per defendants, the July 8, 2021 attendance occurrence was not counted against Steed but documented for human resources' purposes in accordance with Geisinger policy. (Doc. 24-5, J. Marcano Dep., 36:14-24).

Then on July 18, 2021, Steed left work early again. (Doc. 24, SOF ¶ 56).  A TigerText message from Tomsak to Steed states that Marcano will not count this earlier departure against the plaintiff since he had a family emergency. (Doc. 24-2, Pl. Dep., 93:12-94:7; Ex. P-8, at ECF p. 68).  Less than ten (10) days later, on July 27, 2021, Steed failed to appear at work due to a dentist appointment. (Doc. 24, SOF ¶ 61).  Regarding the July 27, 2021 absence, Steed informed Marcano of this appointment on July 26, 2021 via a TigerText message, and stated that he would come to work if the appointment concluded before noon. (Id. ¶ 66). Ultimately, Steed did not work on July 27, 2021, even though his appointment ended before noon. (Id.)

Marcano testified that she recommended Steed's termination on July 27, 2021, four days before Steed received the Termination PIP. (Doc. 24-5, J. Marcano Dep. 24:9-21).  Plaintiff's other supervisor, Tomsak, testified that all termination decisions must be approved by human resources. (Doc. 24-9, Tomsak Dep., 8:3-9).  According to the testimony of the GWVMC employee

relations specialist Kreischer, she considered the written warning in the June 3 PIP as well as the other alleged occurrences when reviewing the recommendation to terminate Steed's employment. (Doc. 24-4, C. Kreischer Dep., 31:1-16). Furthermore, Kreischer testified that Steed's absence on June 21, 2021, was enough to warrant termination. (Id. at 44:11-17). Lastly, Kreischer testified that Steed missing work for a dentist appointment on July 27, 2021 would be an unexcused absence. (Id. at 39:12-20).

Based on the above events, Steed's amended complaint maintains several causes of action. Count I advances claims for discrimination, retaliation, wrongful termination, and failure to accommodate in violation of the ADA. Count II asserts a state law claim for wrongful discharge in violation of public policy. Count III mirrors Steed's claims in Count I and alleges that defendants violated the PHRA. At the close of discovery, defendants filed the instant motion for summary judgment, which brings this case to its present posture.

**Jurisdiction**

Because Steed asserts claims pursuant to the ADA, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). ("In any civil action of which the

district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

**Standard of Review**

Defendants filed a motion for summary judgment seeking dismissal of this action with prejudice.  Granting summary judgment is proper "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4 (3d Cir.1997) (quoting FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990).  The burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248.  A fact is material when it might affect the outcome of the suit under the governing law. <u>Id.</u>  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. <u>Id.</u> at 324.

"In employment discrimination cases, the summary judgment standard 'is applied with added rigor' because 'intent and credibility are crucial issues.'" <u>Walden v. Saint Gobain Corp.</u>, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (quoting <u>Stewart v. Rutgers, The State Univ.</u>, 120 F.3d 426, 431 (3d Cir. 1997)). Moreover:

> Employment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this is clearly a factual question, summary judgment is in fact rarely appropriate in this type of case. Simply by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment.

9

<u>Marzano v. Computer Sci. Corp. Inc.</u>, 91 F.3d 497, 509–10 (3d Cir. 1996) (internal quotation marks, citation, and explanatory parentheticals omitted).

## Analysis

Defendants seek summary judgment on all causes of action asserted in Steed's amended complaint, that is, his various ADA, PHRA, and state common law claims.  The court will address Steed's ADA and PHRA claims first before moving on to his state law claim for wrongful discharge.[3]

### 1. Plaintiff's ADA/PHRA Discrimination Claims

Defendants seek summary judgment on Steed's ADA and PHRA claims for disability discrimination, retaliation, and failure to accommodate.  For ease of disposition, Steed's disability discrimination claims will be analyzed first.

As a preliminary matter, Steed contends that he has direct evidence of disability discrimination.  Direct evidence is evidence, which, if believed, would prove the existence of the fact in issue without inference or presumption. <u>Torre v. Casio, Inc.</u>, 42 F.3d 825, 829 (3d Cir. 1994) (citations omitted).  In the context of discrimination, the evidence must demonstrate that decisionmakers placed

---

[3] Counts I and III of plaintiff's amended complaint assert ADA and PHRA claims using the same legal theories.  The court will address plaintiff's ADA and PHRA claims collectively under the same legal standard. <u>See</u> <u>Morgan v. Allison Crane & Rigging LLC</u>, 114 F.4th 214, 220, n. 21 (3d Cir. 2024) ("federal courts should continue to interpret the PHRA in harmony with the ADA."); <u>Colwell v. Rite Aid Corp.</u>, 602 F.3d 495, 500, n. 2 (3d Cir. 2010) ("[T]he same legal standard that applies to the ADA applies equally to disability discrimination claims under the PHRA.").

substantial negative reliance on an illegitimate criterion in reaching their decision.
See Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 269 (3d Cir. 2010) (citing
Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997); Price
Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)
(quotation marks omitted).  Direct evidence must be "strong enough" for a
factfinder to infer an employer's discriminatory attitude and must be connected to
the challenged employment decision. Id. (citation omitted).  Additionally, "any
statements made by a defendant's employees must be made at a time proximate
to the challenged decision and by a person closely linked to that decision." Id.
(citation omitted).  These requirements for direct evidence create a "high hurdle"
for plaintiffs. Id.

In this case, there is no testimony from a decision-maker directly stating
that Steed was disciplined at work or fired because he has a disability.  Similarly,
no documentary evidence directly indicates that Geisinger terminated the plaintiff
due to a disability.  Rather, Steed's case relies upon indirect evidence or
evidence which requires inferences of disability discrimination.  Employment
discrimination cases relying upon indirect or circumstantial evidence proceed
using the three-part burden-shifting framework from McDonnell Douglas Corp. v.
Green, 411 U.S. 792 (1973)). See Walton v. Mental Health Ass'n. of Se. Pa., 168

F.3d 661, 668 (3d Cir. 1999).  The court will thus apply the McDonnell Douglas

burden-shifting framework to the summary judgment record.

This framework first requires that Steed demonstrate a *prima facie* case of

discriminatory treatment, that is: (1) he has a disability within the meaning of the

ADA; (2) he is otherwise qualified to perform the essential functions of the job,

with or without reasonable accommodations by the employer; and (3) he suffered

an otherwise adverse employment decision as a result of discrimination. See

Morgan, 114 F.4th at 221 & n. 23 (citing Eshleman v. Patrick Indus., Inc., 961

F.3d 242, 245 (3d Cir. 2020); Taylor v. Phoenixville School Dist., 184 F.3d 296,

306 (3d Cir. 1999)) (quotation marks and bracketing omitted).  A *prima facie* case

simply means that the plaintiff presents "a claim that on first sight has enough

merit to proceed." Fowler v. AT&T, Inc., 19 F.4th 292, 298–99 (3d Cir. 2021)

(citing Walton, 168 F.3d at 668).

After plaintiff's demonstration of his *prima facie* case, the burden of

production then shifts to the defendants to articulate a legitimate,

nondiscriminatory reason for the adverse employment action. Shaner v. Synthes,

204 F.3d 494, 500 (3d Cir. 2000) (citing McDonnell Douglas Corp., 411 U.S. at

792).  Then, at the third stage of McDonnell Douglas, the burden shifts back to

the plaintiff to prove, by a preponderance of the evidence, that defendants'

articulated reason was a mere pretext for discrimination. Id.

In their brief, defendants assert that Steed cannot demonstrate any element of a *prima facie* disability discrimination case, that is, he cannot: 1) demonstrate that he was disabled; 2) establish that he was otherwise qualified for the position he held; or 3) prove that he has suffered an otherwise adverse employment decision as a result of discrimination. (Doc. 27, Def. Br. in Supp. at 6-13).  The court will address these issues in turn.

### a. Disability

Under the ADA, it is unlawful for a covered entity to "discriminate against a qualified individual on the basis of disability in regard to…discharge of employees…and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  A plaintiff has a "disability" within the meaning of the ADA if he: (1) has a physical or mental impairment that substantially limits one or more of his "major life activities"; (2) has "a record of such an impairment"; or (3) is "regarded as having such an impairment." Morgan, 114 F.4th at 221 (quoting 42 U.S.C. § 12102(1)).  Claims arising under the first part of the definition are called "actual disability" claims under ADA case law. Id.  Claims stemming from the second part of the definition are called "record of" disability claims. Eshelman v. Agere Sys., Inc., 554 F.3d 426, 437 (3d Cir. 2009).  Lastly, the third part of the definition forms the foundation of "regarded as" disability claims. Morgan, 114 F.4th at 223-24.

13

Here, defendants contend that Steed fails to meet any part of the definition of "disability" based on the record evidence. Steed counters that he has evidence satisfying all three parts of the definition of "disability" under the ADA as it is defined. (Doc. 30, Pl. Br. in Opp. at 25-29).

### i. Actual Disability

The first portion of the definition of "disability" under the ADA, i.e., actual disability, is "a physical or mental impairment that substantially limits one or more" of a plaintiff's "major life activities." Morgan, 114 F.4th at 221 (quoting 42 U.S.C. § 12102(1)). In this case, Steed contends that his back injury qualifies as an actual disability because it was a physical impairment, and it limited his ability to bend and lift. (Doc. 31-1, Pl. Dep., 121:1-6). Defendants maintain that Steed's back injury was a temporary, non-chronic impairment of short duration that falls outside the scope of the definition. (Doc. 27, Def. Br. in Supp. at 13).

Contrary to defendants' assertions, temporary impairments can qualify as an actual disability under the ADA. Morgan, 114 F.4th at 221. The ADA Amendments Act of 2008 broadened the scope of the term "disability" to include an impairment lasting fewer than six months. Id. at 222. That said, the "duration of impairment *is not dispositive* of whether someone is disabled." Id. at 223 (emphasis in original). Rather, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42

U.S.C. § 12102(4)(D).  Moreover, per the definition, the term "disability" is to be "construed in favor of broad coverage of individuals…to the maximum extent permitted by the terms" of the ADA.  42 U.S.C. § 12102(4)(A).  To constitute a disability, an impairment only needs to substantially limit one major life activity—it need not limit them all.  <u>See</u> 42 U.S.C. § 12102(4)(C).

In <u>Morgan</u>, for example, the plaintiff, a millwright laborer, sustained a work-related back injury. 114 F.4th at 218.  The plaintiff's chiropractor first restricted him from "bending or lifting" items over fifteen pounds for a thirty-day period. <u>Id.</u> Then, the chiropractor extended those restrictions for another thirty days before releasing plaintiff to his full occupational duties. <u>Id.</u>  In total, the chiropractor "placed [plaintiff] on bending and lifting restrictions for forty-eight days." <u>Id.</u>  For this reason, before terminating his employment, plaintiff's employer assigned him to light duty work. <u>Id.</u>  The Third Circuit Court of Appeals concluded that "[plaintiff's] back pain, though temporary, nonetheless constituted an actual disability because it substantially limited his ability to perform major life activities 'as compared to most people in the general population.' " <u>Id.</u> at 233. The court noted that the duration of plaintiff's impairment was not dispositive of whether he was disabled. <u>Id.</u> at 233.

Steed's back injury in this case is no different than in <u>Morgan</u>.  Steed introduced evidence demonstrating a genuine issue of material fact as to whether

he meets the definitional requirements through reference to TigerText messages, his deposition testimony, and the testimony of his former supervisors.

For instance, the team lead, Brenda Stanley, testified that she was not aware of Steed's back injury and denied witnessing Steed limping while he was at work. (Doc. 24-10, B. Stanley Dep. 17:20-18:5).  Steed, however, testified that he reported his injury to Stanley the day he was injured when she was on duty. (Doc. 31, Pl. Dep., 78:9-79:1; 84:15-85:7).  As Steed also testified, Stanley directed him to notify his supervisor of his injury. (Id. at 78:23-79:1)

According to Steed, he did just that.  The record includes TigerText messages between Steed and Michael Armour, a technician supervisor at Geisinger.  Steed uses these messages to argue that he informed defendants of his back pain and his difficulty in walking, sitting, squatting and bending due to his back injury. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF pp. 34-35). Steed also testified in this matter that his work injury limited his ability to bend and lift. (Doc. 31-1, Pl. Dep., 121:1-6).  Because walking, lifting, and bending are major life activities, a reasonable jury could find that Steed's back injury constituted an actual "disability" as that term is defined in the ADA.  And as discussed throughout this memorandum, Geisinger terminated Steed before his back injury resolved.

### ii.    "Record of" Disability

Steed also asserts a "record of" disability discrimination claim.  A plaintiff can make a "record of" claim by proving that he had a history of an impairment that substantially limited a major life activity. See Eshelman, 554 F.3d at 437. "Congress included 'record of' disability claims in the ADA to ensure that employees could not be subjected to discrimination because of a recorded history of disability." Id. at 436–37.  In making a "record of" disability claim, a plaintiff has to provide evidence that a defendant relied upon the record of impairment in making its employment decision. Eshelman, 554 F.3d at 437. (citation omitted).  If the record at issue does not reference a disability or condition covered by the ADA, defendants will not be liable even if it did rely on that record in making the adverse employment decision. Id. (citation omitted).

Steed contends that his medical records and testimony establish that he has a history of substantially limiting impairments. (Doc. 30, Pl. Br. in Opp. at 27). Defendants argue that the only medical documentation supplied to them by Steed was a doctor's note, which only demonstrates that the plaintiff attended a doctor's appointment and was released to return to work without any limitations or restrictions several weeks prior to the termination of his employment. (Doc. 27, Def. Br. in Supp. at 7-8; Doc. 31-9, Pl. Ex. I, at ECF p. 2).  Steed also bases his claim on medical records related to his back injury that postdate his termination.

(Doc. 31-15, PL. Ex. O, at ECF p. 14). At this juncture, the court will only consider medical records up to July 31, 2021, the date of Steed's termination.

The inquiry here is thus whether defendants made their employment decision based upon Steed's history of physical impairment. In light of the evidence, Steed's back injury is the only impairment that he had a record of prior to his termination. In his deposition, Steed testified that he was treated with medication and injections after his back injury on July 3, 2021. (Doc. 31-1, Pl. Dep., 90:10-91:15). Steed's medical report from July 8, 2021, supports this testimony. (Doc. 31-15, PL. Ex. O, at ECF pp. 2, 5). Moreover, Steed's medical records from July 28, 2021, linked to his visit to the emergency department, provide that he "injured his lower back when pushing and pulling heavy objects at work 3 weeks ago," and his back pain was persistent and "worsened when he bent over at work earlier that day." (Id. at ECF p. 11). The record contains a note issued by Geisinger Health System indicating that Steed "has been excused from work on Wednesday through Friday July 28th through July 30th due to injury." (Doc. 31-12, Ex. L., Pl. Ex. 13, at ECF p.2). In her testimony, Marcano denied seeing this note. (Doc. 31-2; J. Marcano Dep.,18:13-19-7; 29:7-18). However, Steed testified that he thinks he gave that note to his supervisors. (Doc. 31-1, Pl. Dep., 120:18-25). Therefore, there is a genuine issue of material fact as to whether Steed gave this note to his supervisors.

18

As stated above, Steed's back injury could be deemed as an impairment that substantially limited a major life activity.  Additionally, there is ample evidence that a jury could rely upon to conclude that defendants based their decision to terminate Steed on his record of disability.  First, it is worth reiterating that Steed worked at a hospital campus and was treated in its emergency room. (Doc. 31-7, Pl. Ex. G, Medical Records).  Second, Steed has produced evidence that his absence on July 6, 2021, was related to his back injury and that both supervisors, Tomsak and Marcano, knew that he missed work that day to visit a clinic. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF p. 5).  Although Marcano testified that she did not know the reason behind Steed going to the clinic that day, she also testified that she was made aware of Steed's back pain on July 9, 2021, when he presented her with a doctor's note from July 8, 2021. (Doc. 31-9, Pl. Ex. I, at ECF p. 2; Doc. 31-2; J. Marcano Dep., 27:7-15).  This note indicates that Steed could return to work on July 9, 2021, after being treated in the emergency department. (Id.)  Additionally, in a TigerText message from July 8, 2021, Marcano told Steed "[ok] so go back to the ED." (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF p. 7).  Furthermore, in another TigerText message from July 28, 2021, Steed told Armour that "I need to be seen [M]ike this is bad I barely [sic] can walk if I'm not holding on the Evs cart and last time they just gave me some needles in my back I need and [sic] x[-]ray or something

to determine what the problem is[.]" (Id. at ECF p. 28). A reasonable jury could conclude that, by referencing his back treatment in the TigerText exchanges with his supervisors, Steed placed Armour and Marcano on notice that he was receiving care for his back injury.

Additionally, Steed brought up his appointment for an MRI and x-rays in TigerText messages with Armour on July 29 and 30, 2021. (Id. at ECF pp. 34, 38). Also, on July 30, 2021, Steed told Armour that his cause of pain is still unknown, but the doctors "said sciatica," and prescribed prednisone (Id. at ECF p. 41). Then, on July 31, 2021, Steed communicated to Marcano in a TigerText message that "the doctor said someone was supposed to do an injury report but that never happened." (Id. at ECF p. 50). Following all these exchanges between Steed and his supervisors about his back pain, doctor's appointments, and medical treatment, Tomsak asked Scott Viadock, a security personnel, via a TigerText message, if he could assist with a termination of an employee on July 31, 2021. (Id. at ECF p.51; Doc. 31-5, Tomsak Dep., 36:19-37:12). Tomsak confirmed in his testimony that he was referring to Steed. (Doc. 31-5, Tomsak Dep., 36:19-37:12).

Given the evidence at hand, a reasonable jury could find all these exchanges between Steed and his supervisors sufficient to establish the existence of a recorded history of disability for the plaintiff. Moreover, the jury

20

could disbelieve defendants' arguments that the recommendation to terminate Steed was made on July 27, 2021, the day of his dentist appointment. A reasonable juror could construe the TigerText message from July 31, 2021, between Tomsak and Scott Viadock, the security personnel, as the date on which defendants decided to terminate Steed, relying on his record of disability.

Lastly, the TigerText messages from July 30 and 31, 2021, memorialize Steed's continuous but failed attempts to provide his supervisors, Armour and Marcano, with paperwork related to his injury. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF pp. 30, 37, 39, 41, 42, 44, 48, 50). However, Steed's failure to share this paperwork with his supervisors is not fatal to his "record of" claim, as a jury could rely solely on the TigerText exchanges detailed above to conclude that he has a "record of" disability. Accordingly, defendants' motion for summary judgment will be denied as to Steed's "record of" disability claim in Count I.

### iii.   "Regarded as" Claim

Lastly, in their motion for summary judgment, defendants challenge plaintiff's evidence regarding the third way "disability" is defined by the ADA, that is, whether plaintiff was "regarded as" having an impairment.[4] (Doc. 27, Def. Br.

---

[4] Defendants included these arguments in footnote 2 of their brief in support. (Doc. 27, Def. Br. in Supp. at 7). The court briefly addresses them here.

in Supp. at 7).  Steed maintains that he has presented sufficient evidence
showing that his termination by defendants was based upon their perception of
his back condition. (Doc. 30, Pl. Br. in Opp. at 28).

In comparison to an actual disability claim, "the requirements for a *prima
facie* 'regarded as' claim are less demanding." <u>Morgan</u>, 114 F.4th at 224 (quoting
<u>Mancini v. City of Providence by & through Lombardi</u>, 909 F.3d 32, 46 (1st Cir.
2018)).  Proof of a "regarded as" claim requires showing of prohibited action
taken by the employer "because of an actual or perceived physical or mental
impairment whether or not the impairment limits or is perceived to limit a major
life activity." <u>Id.</u> at 223-24 (quoting 42 U.S.C. § 12102(3)(A)).

Relief for a "regarded as" claim that is both "objectively transitory **and**
minor" is precluded. <u>Id.</u> (citing 42 U.S.C. § 12102(3)(B)(emphasis added).  An
impairment lasting fewer than six months is transitory but not necessarily minor
and may still be regarded as a disability. <u>Id.</u> (citing <u>Eshleman</u>, 961 F.3d at 247-
48).  "Minor is not defined by statute, but '[c]overage under the 'regarded as'
prong . . . should not be difficult to establish.' " <u>Id.</u> (quoting 29 C.F.R. § pt. 1630,
app., "Section 1630.2(l) Regarded as Substantially Limited in a Major Life
Activity").  Whether an impairment is minor should be decided on a "case-by-
case basis." <u>Id.</u> (citing <u>Eshleman</u>, 961 F.3d at 249–250).

Here, Steed's impairment—including difficulty in walking, sitting, squatting or bending—is transitory, as it appears to have lasted less than six months. Nevertheless, it should not be automatically categorized as minor.  Minor impairments include "common ailments like the cold or flu," which fall "at the lowest end of the spectrum of severity."  <u>Eshleman</u>, 961 F.3d at 248 (quoting H.R. Rep. No. 110–730 pt. 2, at 18 (2008)).  Additionally, Steed's supervisors were aware of his back injury and the difficulties it caused him. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF pp. 26-51).  TigerText messages indicate that, just prior to his termination, Steed was reporting to a supervisor that his back pain had worsened and that he had been prescribed steroid medication and sent for diagnostic studies. <u>Id.</u>  Steed also reported to a supervisor that his back pain was limiting his abilities to bend, lift, and walk. <u>Id.</u>  A reasonable jury could determine that plaintiff's back injury amounted to more than a minor impairment. Hence, the summary judgment record contains sufficient evidence from which a jury conceivably could conclude that Steed was "regarded as" having an impairment prior to his termination.

## b. Whether Plaintiff was "Qualified"

In addition to demonstrating a disability within the meaning of the ADA as part of his *prima facie* case, Steed must also show that he is otherwise qualified to perform the essential functions of the job with or without reasonable

accommodations by the employer. See Morgan, 114 F.4th at 221 & n. 23 (citations omitted).  Specifically, under the law, Steed must demonstrate that he is a "qualified individual" that is, "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  Under the definition of "qualified individual," consideration "shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." Id.

In the case at hand, defendants challenge whether Steed was qualified to perform the essential functions of his technician position with or without reasonable accommodations. (Doc. 27, Def. Br. in Supp. at 10).  In doing so, defendants do not cast doubt as to whether Steed possesses the appropriate educational background, employment experience, or skills.  Rather, defendants assert that Steed does not meet the second prong of the definition of "qualified individual," i.e., whether he could perform the essential functions of the position he held because he was frequently absent from work in violation of defendants' policy. (Doc. 27, Def. Br. in Supp. at 9-11).

The inquiry thus is not whether an employee can perform all aspects of the job, but only essential ones. See Deane v. Pocono Med. Ctr., 142 F.3d 138, 147

(3d Cir. 1998) ("Congress explained that the [ADA] focused on an individual's

ability to perform 'essential functions' to ensure that persons with disabilities 'not

be disqualified because of the inability to perform non-essential or marginal

functions of the job.'") (quoting House Judiciary Report at 31–32, reprinted in

1990 U.S.C.C.A.N. at 454).  In order to determine whether an individual can

perform the essential functions of the position with or without reasonable

accommodation:

> First, a court must consider whether the individual can
> perform the essential functions of the job without
> accommodation.  If so, the individual is qualified (and, *a*
> *fortiori*, is not entitled to accommodation). If not, then a
> court must look to whether the individual can perform the
> essential functions of the job with a reasonable
> accommodation. If so, the individual is qualified. If not, the
> individual has failed to set out a necessary element of the
> *prima facie* case.

Deane, 142 F.3d at 146.

As for the essential functions of a position, that refers to fundamental job

duties, excluding the marginal functions of the position. 29 C.F.R. § 1630.2(n)(l)

(2019).  The question of whether a particular duty is an essential function of a

particular job is a factual determination "for the jury to decide." Turner v. Hershey

Chocolate US., 440 F.3d 604, 613 (3d Cir. 2006).  Pursuant to the EEOC's

interpretive guidance, "[t]he determination of whether an individual with a

disability is qualified is to be made at the time of the employment decision…" 29 C.F.R. § pt. 1630, app. 1630.2(m) (2019).

For summary judgment purposes, defendants categorize Steed's physical presence at work as a requirement for his position at Geisinger. (Doc. 27, Def. Br. in Supp. at 9-11).  Defendants assert that Steed's failure to come to work proves his inability to perform the essential function of his job as well as the other essential tasks of the position with or without reasonable accommodation. (Id.) Defendants argue that Steed was not a qualified individual under the ADA because he had an excessive number of absences while he was still within the terms of the introductory period. (Id. at 10).

The record reflects that Geisinger included eleven (11) unscheduled occurrences in Steed's Termination PIP. (Doc. 24-2, Def. Ex. A., Pl. Dep., Ex. P-4, Performance Improvement Plan, at ECF pp. 64-66).  Out of these occurrences, seven (7) were unrelated to his back injury. (Id.)  Evidence in the record demonstrates that GWVMC raised the absenteeism issue with Steed on June 3, 2021, prior to his back injury, when he allegedly accrued four (4) unscheduled occurrences. (Doc. 24-2, Def. Ex. A., Pl. Dep., Ex. P-3, Performance Improvement Plan, at ECF pp. 62-63).  According to the Termination PIP, Steed had two (2) allegedly unscheduled absences between

June 3, 2021, and July 3, 2021. (Doc. 24-2, Ex. P-4, at ECF pp. 64-66).  He then accrued five (5) unscheduled absences until his termination. (Id.)

In his deposition, Steed denied that the occurrences preceding his back injury were unscheduled and asserted that, for some occurrences, he requested days off while he was within his allotted paid time off, and for others, he notified his supervisors in advance. (Doc. 31-1, Pl. Dep., 46:18-48:17; 53:19-25; 56:17-24; 61:6-17).  As for the June 3 PIP, even though this document indicates that the attendance policy and calling off procedures were reviewed with Steed, the plaintiff denied that this review actually occurred in his deposition testimony. (Doc. 24-2, Def. Ex. A., Pl. Dep., Ex. P-3, Performance Improvement Plan, at ECF pp. 62-63; Doc. 31-1, Pl. Dep., 58:11-25).  Per Steed's testimony, these time-off procedures were never explained; otherwise, he would have followed them. (Doc. 31-1, Pl. Dep., 59:15-60:14).

Steed also reported that he was told by his supervisors, after his back injury, that leaving work early for treatment on July 8 and 18, 2021, was not going to be counted against him for attendance purposes. (Doc. 31-2, J. Marcano Dep., 27:7-15; Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF pp. 224-225). Additionally, Marcano's testimony confirms that Steed was told that his July 8, 2021, absence was not counted against him.  (Doc. 24-5, J. Marcano Dep., 36:14-24).  Kreischer, the employee relations specialist at GWVMC, also testified

that listing the July 18, 2021 occurrence on the termination PIP was an oversight. (Doc. 24-4, C. Kreischer Dep. 38:11-24; see also Doc. 24-2, Def. Ex. A., Pl. Dep., Ex. P-4, Performance Improvement Plan at ECF pp. 64-66).

As for the final days of Steed's employment, his issues related to a back injury overlap with dental issues. The record reflects that plaintiff failed to appear for work on July 27, 2021, after giving less than twenty-four (24) hours' notice to his supervisor, Marcano, that he had a dentist appointment. (Doc. 24-2, Pl. Dep. 95:16-98:10). Specifically, Steed informed Marcano of this appointment on July 26, 2021, via a TigerText message stating that he would come to work if the appointment concluded before noon. (Doc. 24, SOF ¶ 66). Steed, however, did not work that day even though his appointment ended before noon. (Id.)

Nevertheless, per Steed's testimony, attendance policies and call-off procedures were not reviewed with him even after he received a written warning about attendance. Moreover, Steed testified that the reason for not returning to work on July 27, 2021, was that his dental procedure required stitches and caused excessive bleeding, swelling, and pain. (Doc. 31-1, Pl. Dep., 98:8-18). Steed also presented or attempted to present documentation from his dentist regarding the absence. (Doc. 24-2, Def. Ex. A, Pl. Dep. Pl. Ex. P-10, Aspen Dental Record).

Steed's dental issue and his back injury were known to Marcano, who testified that she recommended termination after the plaintiff's July 27, 2021 dental appointment and after he left work to treat for his back injury several times earlier that month. (Doc. 24-5, J. Marcano Dep. 24:9-24; 27:7-15; 36:14-24). The day after the dentist appointment, July 28, 2021, and while at work, Steed reported to his supervisor, Armour, that he needed to be seen for his back because he could barely walk. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF pp. 28–29). The next day, July 29, 2021, Marcano messaged Armour and stated, "I saw [plaintiff] called off again[.] Chances are he won't come in tomorrow." (Id. at ECF p. 33). Within an hour of that message between Marcano and Armour, Steed messaged Armour and advised that he had an appointment with a doctor for diagnostic imaging of his back. (Id. at ECF p. 34). Another message from Steed to Armour that day indicates that the plaintiff could not sit down, squat, or bend. (Id. at ECF p. 35). On July 30, 2021, Steed advised Armour that he had been prescribed prednisone and could barely walk. (Id. at ECF pp. 39-40). Steed was then terminated on July 31, 2021.

After review of the evidence here, in order to rule in favor of defendants on this issue, the court would have to resolve the above conflicts in the record in their favor and weigh the credibility of witnesses. The court would also have to overlook inferences that may be drawn in Steed's favor from the TigerText

messages.  Thus, defendants' motion for summary judgment is denied on the issue of whether Steed was "qualified" under the ADA.

### c. Adverse Employment Decision

Defendants also challenge the third element of Steed's *prima facie* case, that the adverse employment action was because of his disability.  Steed, however, has pointed to evidence raising a genuine issue of material fact.  Steed testified that he informed Marcano of his work-related back injury on July 5, 2021. (Doc. Pl. Dep., 86:4-87:9).  Additionally, he produced the above-discussed TigerText messages.  Those messages reflect that Steed communicated to his supervisors that his back was hurting, and he could barely walk or bend over. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF pp. 26-51).  Steed has produced evidence that his absence on July 6, 2021, was related to his back injury and that both supervisors, Tomsak and Marcano, knew that he missed work that day to visit a clinic. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF p. 5).

As previously discussed, defendants listed Steed's absences from July 8 and 18, 2021 as unscheduled occurrences on his Termination PIP even though his supervisors assured him that leaving work early on these days was not going to be counted against him. (Doc. 31-2, J. Marcano Dep., 27:7-9, Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF pp. 18, 19).  Steed contends that these

absences factored into defendants' decision to terminate his employment. (Doc. 24-2, Def. Ex. P-4, Performance Improvement Plan, at ECF pp. 64-66).

Plaintiff submits that defendants terminated him within days of his leaving early on July 28, 2021 due to his back injury and while he was reporting to his employer that his physical limitations were worsening. With the above evidence, Steed has demonstrated a *prima facie* case of disability discrimination.

### d. Defendants' Legitimate, Non-Discriminatory Reasons

After demonstration of a *prima facie* case of disability discrimination, the burden then shifts to defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Shaner, 204 F.3d at 500 (citing McDonnell Douglas Corp., 411 U.S. at 792). Here, defendants documented that they terminated Steed because of his eleven (11) unscheduled occurrences. (Doc. 24-2, Def. Ex. A, Pl. Dep. Ex. P-4, Performance Improvement Plan, at ECF p. 64-66). Additionally, Kreischer, the employee relations specialist at GWVMC, testified that she took into consideration the June 3 PIP as well as the other allegedly unscheduled occurrences while reviewing the recommendation to terminate Steed's employment. (Doc. 24-4, C. Kreischer Dep., 31:1-16). Per Kreischer's testimony, Steed's absence on June 21, 2021, was enough in and of itself to warrant termination under GWVMC's policy. (Id. at 44:11-17). Moreover, defendants contend that Steed's unscheduled absences significantly affected

31

their facilities' hygiene and added pressure on the remaining employees. (Doc.

27, Def. Br. in Supp. at 10).  Defendants have thus met their burden of

establishing legitimate, non-discriminatory reasons for terminating Steed's

employment.

### e. Proof of Pretext

Given that defendants have advanced legitimate, non-discriminatory

reasons for Steed's termination, the burden then shifts back to the plaintiff to

demonstrate that defendants' articulated reasons were a mere pretext for

discrimination. Shaner, 204 F.3d at 500 (citing McDonnell Douglas Corp., 411

U.S. at 792).

"To defeat summary judgment... the 'plaintiff must point to some evidence,

direct or circumstantial, from which a factfinder could reasonably either (1)

disbelieve the employer's articulated legitimate reasons; or (2) believe that an

invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action.' " Canada, 49 F.4th at 347 (quoting

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).  An employee may meet

his burden by "painting the [employer's articulated reasons] as weak, implausible,

contradictory, or incoherent." Id. (quoting Fuentes, 32 F.3d at 765).

Although defendants have offered evidence that Steed's termination

occurred as a legitimate response to excessive unscheduled absenteeism,

plaintiff has countered defendants' explanation with sufficient evidence that their proffered reasons were pretextual and that the real reason for his termination was his back injury, i.e., his disability. (Doc. 30, Pl. Br. in Opp. at 29).  Steed can point to the numerous contradictions in the record as to the defendants' knowledge of his disability prior to his termination as well as defendants' approval of his unscheduled absences which were later counted against him.

Starting with defendants' knowledge of Steed's disability, defendants contend that neither individual involved in the decision to terminate Steed's employment was aware of any type of medical condition purportedly suffered by Steed at the time the termination decision was made. (Doc. 24, SOF ¶¶ 81, 83, 85, 86, 97, 99-100, 103).  Despite these assertions, a TigerText message from July 6, 2021, indicates that Tomsak, Steed's supervisor, told Marcano, his other supervisor, that Steed went to a clinic. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF p. 5).  Additionally, TigerText messages between Steed and Marcano from July 8, 2021, show that he informed Marcano of his back injury. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF pp. 8-11).  The messages contain the following exchange:

> From: Steed
> To: Marcano, Jennifer
> > -I'm excuse [sic] for the rest of the day my back is really hurting
> > -Hey Jenn I'm about to check in to the emergency room i [sic] having bad back pain and it's killing me

> -After I loaded up the truck Saturday it been hurting
> -The doctor said she think [sic] that I sprained my
> back or tore a muscle so I'm still waiting

(Id. at ECF pp. 8, 11, 13, 14).

Moreover, Steed's supervisor, Marcano, testified that, on July 9, 2021, Steed presented a note stating that he was seen and treated in the emergency department on July 8, 2021. (Doc. 31-2, J. Marcano Dep. at 26:18-27:9). She also testified that she was aware of Steed's back pain prior to her recommendation to terminate him on July 27, 2021. (Id. at 27:7-15). As mentioned above, Steed's absence from work that day for dental issues could be viewed as something the defendants used as grounds for Steed's termination after he missed more time from work beginning on July 28, 2021, due to his back injury.

Regarding defendants' assertions that Steed's termination was the result of his repeated failures to come to work or stay for an entire shift while in his introductory period, the record contains enough evidence to rebut those assertions. First, the June 3 PIP detailed that the attendance policy and calling off procedure were reviewed with Steed. (Doc. 24-2, Def. Ex. A, Pl. Dep. Ex. P-3, Performance Improvement Plan, at ECF pp. 62-63). However, Steed denies that this actually occurred in his testimony. (Doc. 31-1, Pl. Dep. 58:11-25). Second, Steed was told that leaving work early on July 8 and 18, 2021 was not going to

34

be counted against him for attendance purposes, yet the Termination PIP listed these absences as unscheduled occurrences. (Doc. 24-5, J. Marcano Dep., 36:14-24; Doc. 24-2, Def. Ex. A, Pl. Dep. Ex. P-4, Performance Improvement Plan, at ECF pp. 64-66). Third, per a TigerText message from July 28, 2021, Steed's supervisor, Armour, asked him if he needed to be seen in the emergency department or go home. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF p. 26). Steed chose to seek treatment, reported that his condition worsened and caused him greater physical limitations. In the end, Steed was terminated from his position. This evidence could lead a reasonable jury to infer that the defendants terminated Steed because of his physical impairments as opposed to his unscheduled absences. When reviewing the overall scenario in a light most favorable to Steed, he has provided sufficient evidence on the issue of whether he experienced disability discrimination by defendants to preclude summary judgment on the ADA/PHRA discrimination claims. Summary judgment on these disability discrimination claims will thus be denied.

## 2. Plaintiff's ADA/PHRA Retaliation Claims

Defendants also move for summary judgment on Steed's retaliation claims. Retaliation claims are evaluated at the summary judgment stage in the same

manner as disability discrimination claims through application of the McDonnell Douglas framework.[5] Canada, 49 F.4th at 340. (citations omitted).

To establish a *prima facie* case of retaliation in the ADA context, a plaintiff must prove: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002) (citation omitted).

### a.    Protected Activity

Defendants argue that Steed did not engage in a protected activity. (Doc. 27, Def. Br. in Supp. at 21).  Under the law, good faith requests for reasonable accommodations are protected activities sufficient to support an ADA retaliation claim. See Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003); see also Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010).  In support of their argument, defendants advance that "the record is devoid of any facts illustrating that [plaintiff] engaged in any protected activity." (Doc. 27, Def. Br. in Supp. at 21).

---

[5] The ADA's anti-retaliation provision provides, in relevant part, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by" the ADA.  42 U.S.C. § 12203(a).

Steed, however, counters that the TigerText messages show that he told his supervisors, Marcano and Tomsak, that his back was hurting, and he could barely walk or bend over. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF p. 26-32). The message exchange on July 8, 2021, between Steed and Marcano reveals that Marcano had notice that Steed's back was "really hurting" which prompted him "to check the emergency room." (Id. at ECF pp. 8-11).

Also, on July 9, 2021, the following exchange occurred:

> From: Steed
> To: Marcano
> > -I can bring the empty it's just the full ones [sic] going to be heavy on my back even the trash is hurting my back but I'm just taking it easy
> > -I [sic] going to need help with the red carts it going to be to [sic] heavy for me to push

(Id. at ECF pp. 16-17).

Furthermore, Steed asserts that he requested accommodations on July 28 and July 29, 2021, as shown in TigerText messages. (Doc. 30, Pl. Br. in Opp. at 10). As the record reflects, on July 28, 2021, Steed reported to his supervisor, Armour, that he could barely walk or bend over and requested that Armour send someone to examine him. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF p. 29). As another TigerText message from July 28, 2021 shows, Armour asked Steed whether he needed to go home or be seen in the emergency department. (Id. at ECF p. 26). Steed's message to Armour on July 29, 2021, indicates that

37

he could not sit, squat or bend, due to his back not feeling any better, resulting in another absence. (Id. at ECF pp. 34-35).  On July 30, 2021, Steed reported to Armour that he was in a lot of pain, exhausted, and went to the hospital for x-rays related to his back injury. (Id. at ECF p. 38).  More messages from that date indicate that Steed told Armour that he was prescribed prednisone for the injury and still had problems walking. (Id. at ECF pp. 40-41).

As for the testimony of Steed's supervisors, Armour explained that he would have normally reported Steed's back injury to the other supervisor, Marcano, even if he does not recall doing so. (Doc. 31-3, M. Armour Dep., 27:23-28:8, 29:3-13).  Marcano testified that if she were in Armour's shoes, she would have informed human resources about communications with Steed concerning his back. (Doc. 31-2, J. Marcano Dep. 40:15-22).  Lastly, Armour testified that if an employee requests an accommodation such as light duty, that would be forwarded to human resources. (Doc. 31-3, M. Armour Dep., 32:1-8).

Under the law, disability discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an…employee." 42 U.S.C. § 12112(b)(5)(A).  The term "reasonable accommodation" may include "job restructuring" and "part-time or modified work schedules[.]" 42 U.S.C. § 12111(9). Moreover, an "employer must make reasonable accommodations to an

employee's 'known' disability." <u>Taylor</u>, 184 F.3d at 313 (citing 42 U.S.C. § 12112(b)(5)(A)).  Requests for reasonable accommodation do not need to be in writing, or be made by the employee, and do not need to mention the ADA or formally invoke any "magic words." <u>Id.</u> Rather, the notice must only "make clear that the employee wants assistance for his or her disability." <u>Id.</u>

The summary judgment record reflects that Steed shared details about his back injury with his supervisors via TigerText messages and requested help in completing his tasks.  The record also shows that Steed requested to leave early on some days to get his back checked by doctors.  That said, Steed can advance a reasonable argument that these messages provided the requisite notice to defendants that he had a known disability to be reasonably accommodated pursuant to the ADA.  Accordingly, the motion for summary judgment must be denied on the issue of whether Steed engaged in protected activity as part of his *prima facie* ADA retaliation case.

### b. Causal Connection

Defendants also argue that plaintiff's retaliation case lacks a causal connection. (Doc. 27, Def. Br. in Supp. at 23).  "[I]n cases where a plaintiff must illustrate a 'causal link' for purposes of establishing retaliation, or show that certain conduct was 'used' as a basis for employment decisions, a plaintiff may

rely upon a broad array of evidence to do so." <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 283-84 (3d Cir. 2000).

To demonstrate a causal link, a plaintiff generally must establish a temporal proximity between the protected activity and the allegedly adverse action that is unusually suggestive of retaliatory motive. <u>McLaughlin v. Fisher</u>, 277 F. App'x 207, 218 (3d Cir. 2008) (quoting <u>Krouse</u>, 126 F.3d at 503). "An inference of 'unduly suggestive' temporal proximity begins to dissipate where there is a gap of three months or more between the protected activity and the adverse action." <u>Moody v. Atl. City Bd. of Educ.</u>, 870 F.3d 206, 221 (3d Cir. 2017) (citing <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 233 (3d Cir. 2007)). The proximity between an email complaint to human resources relating to discrimination and the employee's termination six weeks later could be enough to infer causation. <u>Qin v. Vertex, Inc.</u>, 100 F.4th 458, 477 (3d Cir. 2024). In <u>Jalil v. Avdel Corp</u>, the Third Circuit concluded that two (2) days between the protected activity and the alleged retaliation sufficed to support an inference of a causal connection. 873 F.2d 701, 708 (3d Cir.1989).

Although there is considerable evidence to discuss here, such discussion would be redundant. The TigerText messages between Steed and his supervisors illustrate that Steed informed them that his back was hurting, and he could barely walk or bend over in the days just prior to his termination. (Doc. 31-

40

6, Pl. Ex. F., TigerText Messages, at ECF pp. 26-46). On July 31, 2021, Steed tried to provide Marcano with "paperwork from what [sic] been going on with [his] injury" and he told her that he had been keeping Armour updated. (Doc. 31-6, Pl. Ex. F., TigerText Messages, at ECF p. 48). Steed was fired that same day.

Defendants' attempt to argue that this timing is not unduly suggestive is unpersuasive. The above evidence is sufficient to raise genuine issues of material fact regarding causation.

The rest of the McDonnell Douglas analysis for Steed's ADA retaliation claim plays out much like the second and third steps of his ADA discrimination claim. The court has addressed defendants' legitimate, nondiscriminatory reasons above and Steed's evidence in response to show pretext and need not reiterate that evidence here. Consequently, the motion for summary judgment regarding Steed's ADA/PHRA retaliation claims will be denied.

### 3. Plaintiff's ADA/PHRA Failure to Accommodate Claim

In conjunction with the above arguments, defendants also request summary judgment on Steed's failure to accommodate claim. A plaintiff bringing an ADA failure to accommodate claim must establish: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." Capps v. Mondelez Glob., LLC, 847 F.3d 144, 157

(3d Cir. 2017) (quoting <u>Armstrong v. Burdette Tomlin Mem'l Hosp.</u>, 438 F.3d 240, 246 (3d Cir. 2006) (footnote and additional citations omitted)).  The evidence regarding these elements, along with the evidence relative to the other steps in the <u>McDonnell Douglas</u> framework have been sufficiently addressed above. There are genuine issues of fact to be resolved by a jury regarding Steed's failure to accommodate claim and thus defendants' motion for summary judgment on this claim will be denied.[6]

### 4. Plaintiff's State Law Claim for Wrongful Discharge

Defendants also move for summary judgment on Steed's claim for wrongful discharge in violation of Pennsylvania public policy.

The general rule under Pennsylvania law is that there is "no common law cause of action against an employer for termination of an at-will employment relationship." <u>Clay v. Advanced Computer Applications, Inc.</u>, 559 A.2d 917, 918 (Pa. 1989) (citing <u>Geary v. United States Steel Corp.</u>, 319 A.2d 174 (Pa. 1974)). Nevertheless, "exceptions to this rule 'have been recognized in only the most limited of circumstances, where discharges of at-will employees would threaten clear mandates of public policy.' " <u>Weaver v. Harpster</u>, 975 A.2d 555, 563 (Pa. 2009) (quoting <u>Paul v. Lankenau Hospital</u>, 569 A.2d 348 (Pa. 1990)).

---

[6] It is worth noting that a "regarded as" claim cannot serve as a basis for a reasonable-accommodation claim. <u>See</u> 42 U.S.C.§ 12201(h).  The court thus limits its conclusions to the pertinent definitions of "disability."

As the Supreme Court of Pennsylvania has previously held, public policy comes into play when an employee pursues a claim for retaliatory discharge for filing a workers' compensation claim. Shick v. Shirey, 716 A.2d 1231, 1232 (Pa. 1998). The Third Circuit has noted that a cause of action exists "for wrongful discharge of an employee who files a claim for workers' compensation benefits with an employer but has not filed a claim petition with the Bureau." Morgan, 114 F.4th at 226 (quoting Owens v. Lehigh Valley Hosp., 103 A.3d 859, 869 (Pa. Commw. Ct. 2014)).

The Supreme Court of Pennsylvania has not yet established the elements of a *prima facie* retaliatory discharge claim. See Spring v. Sealed Air Corp., 483 F. App'x. 765, 768 (3d Cir. 2012); Deily v. Waste Management of Allentown, 55 F. App'x. 605, 608 (3d Cir. 2003). For this reason, federal courts have regularly employed the familiar burden-shifting framework for a retaliatory discharge claim under Title VII. See Spring, 483 F. App'x. at 768; Larochelle v. Wilmac Corp., 769 F. App'x 57, 60 (3d Cir. 2019); Owens, 103 A.3d at 861.

That said, Steed must first demonstrate a *prima facie* case of wrongful discharge for filing a workers' compensation claim, that is: (1) he engaged in protected activity; (2) he suffered an adverse employment action either after or contemporaneously with the protected activity; and (3) there is a causal connection between the protected activity and the alleged adverse action. See

43

Spring, 483 F. App'x. at 768; Shellenberger, 318 F.3d at 187; Larochelle, 769 F.

App'x 57, 60.  As for protected activity, "[w]hen an employee intends to file a

workers' compensation claim, but never actually files such a claim prior to any

alleged retaliation, to demonstrate that he engaged in protected activity [,] the

employee must at least express to his employer his intent to file a workers'

compensation claim." Morgan, 114 F.4th at 226.

Defendants contend that Steed failed to file a workers' compensation claim

while employed with Geisinger and that no individual at Geisinger, "management

or otherwise," had any knowledge of Steed's purported disability or alleged work

injury during his employment. (Doc. 27, Def. Br. in Supp. at 23).  Steed has

established that he reported his workplace injury for summary judgment

purposes as discussed above.  But, after a careful review of the record, summary

judgment on Steed's state law wrongful discharge claim will be granted.

First, there is no evidence that Steed has ever intended to file a worker's

compensation claim prior to his termination.  In response to the summary

judgment motion, Steed introduced an email from defendants' Employee Health

Department dated July 29, 2021, which contains the subject: "e-secure Workers'

Compensation Daily ED List 7-29-21." (Doc. 31-8, Pl. Ex. H, at ECF p. 1-2).  The

email shows that a nurse practitioner advised Steed to complete an injury report

and that she offered her assistance if needed. (Id.)  The email, however, does

44

not contain any indication that Steed intended to file a worker compensation claim. (Id.)  Rather, per this email, Steed insisted on seeing his primary care provider rather than completing an injury report and filing a worker's compensation claim.

As the record reflects, Steed waited until August 10, 2021, after his termination, to express his desire to file a worker's compensation claim. (Pl. Dep., Ex. P-13, at ECF p. 75).  In fact, both parties agree that Steed sent a letter to defendants on August 10, 2021, requesting workers' compensation insurance information in order to file a claim.  (Doc. 24-2, Pl. Dep.,114:11-115:5; Doc. 24, SOF ¶ 105).  Steed testified that this was the first time he submitted a writing to defendants regarding his back injury. (Doc. 24-2, Pl. Dep. 115:23-116:12).

Thus, even if Steed intended to file a workers' compensation claim, the record lacks evidence that he expressed his intent to Geisinger to do so prior to his termination.  Hence, Steed's allegations that he was discharged for making workers' compensation benefits claims and seeking worker's compensation benefits lack evidentiary support.  For summary judgment purposes, the court must reject the nonmoving party's bare assertions, conclusory allegations, suspicions, and vague statements. See Nitkin v. Main Line Health, 67 F.4th 565, 571 (3d Cir. 2023) (citations omitted). Consequently, Steed's failure to file or suggest to anyone at Geisinger that he intended to file for workers' compensation

prior to his termination is fatal to his wrongful discharge claim. Thus, defendants'

motion for summary judgment will therefore be granted as to Count II.

## Conclusion

For the reasons set forth above, defendants' motion for summary judgment,

(Doc. 23), will be granted in part and denied in part. Summary judgment will be

granted in favor of defendants on plaintiff's state law wrongful discharge claim in

Count II. The motion will otherwise be denied. An appropriate order follows.


Date: 7/25/25

_____
JUDGE JULIA K. MUNLEY
United States District Court